October 10, 1979

## 79-75   MEMORANDUM OPINION FOR THE ATTORNEY GENERAL

### Constitutional Convention—Limitation of Power to Propose Amendments to the Constitution

You have requested our opinion on a question that involves the "Convention Clause" of Article V of the Constitution:

> The Congress * * * on the Application of the Legislatures of two thirds of the several States, shall call a Convention for proposing Amendments, which * * * shall be valid to all Intents and Purposes, as part of this Constitution, when ratified by the Legislatures of three fourths of the several States, or by Conventions in three fourths thereof, as the one or the other Mode of Ratification may be proposed by the Congress * * * .[1]

Your question is whether this clause authorizes a general or a limited convention process. Does a "Convention for proposing Amendments," called by Congress on application of two-thirds of the legislatures of the States, have general power to propose amendments on any subject that commands the attention of the delegates? Under what circumstances, if any,

---

[1] The entire text of Article V follows:

The Congress, whenever two thirds of both Houses shall deem it necessary, shall propose Amendments to this Constitution, or, on the Application of the Legislatures of two thirds of the several States, shall call a Convention for proposing Amendments, which, in either Case, shall be valid to all Intents and Purposes, as Part of this Constitution, when ratified by the Legislatures of three fourths of the several States or by Conventions in three fourths thereof, as the one or the other Mode of Ratification may be proposed by the Congress; Provided that no Amendment which may be made prior to the Year One thousand eight hundred and eight shall in any Manner affect the first and fourth Clauses in the Ninth Section of the first Article; and that no State, without its Consent, shall be deprived of its equal Suffrage in the Senate.

may the powers and the proposals of the convention be limited to a particular field? This question has been warmly debated among constitutional scholars and officers of Government.[2] It has never been answered or even addressed by any court. Our views are set forth below.

## I.  The Convention of 1787

In the summer of 1787 delegates from 12 of the 13 United States assembled in Philadelphia. They had been called to Philadelphia by Congress, and their purpose was to consider and propose amendments to the Articles of Confederation and constitution of the young Nation. They labored through the summer and produced a new and enduring document, the very Constitution that your question requires us to construe.

One of the important questions that confronted the delegates in Philadelphia was whether they should honor the procedural limitations that governed the amendment process. These limitations were created by Article XIII of the Articles of Confederation and by the Act of Congress pursuant to which the convention had been called. Under the Act the convention was to consider and propose amendments to the Articles, and the amendments were to become effective when approved by Congress and each of the States.[3] The Act was declaratory of the Articles themselves. The Articles allowed for amendment, but they declared that the Union of the 13 States would be "perpetual" and that the government could not be altered unless the alteration were "agreed to in a Congress of the United States * * * and * * * confirmed by the Legislatures of every State." Article XIII.

---

[2]*See* Dellinger, "The Recurring Question of the 'Limited' Constitutional Convention," 88 Yale L.J. 1623 (1979); Van Alstyne, "Does Article V Restrict the States to Calling Unlimited Conventions Only?—A Letter to a Colleague," 1978 Duke L.J. 1295; Rhodes, "A Limited Federal Constitutional Convention," 26 U. Fla. L. Rev. 1 (1973); Bonfield, "The Dirksen Amendment and The Article V Convention Process," 66 Mich. L. Rev. 949 (1968); Note, "Proposed Legislation on the Convention Method of Amending the United States Constitution," 85 Harv. L. Rev. 1612, 1629 (1972); Black, "Amending the Constitution: A Letter to a Congressman," 82 Yale L.J. 189, 202–03 (1972); Special Constitutional Convention Study Comm., American Bar Assoc., "Amendment of the Constitution by the Convention Method Under Article V" (1974); Pullen, "The Application Clause of the Amending Provision of the Constitution" (1951) (unpublished thesis on file at University of North Carolina Library); Orfield, *Amending the Federal Constitution* (1942); Jameson, *A Treatise on Constitutional Conventions* (4th ed., 1887); Bonfield, "Proposing Constitutional Amendments by Convention," 39 Notre Dame Lawyer 659 (1964); Black, *Handbook of American Constitutional Law* (West Pub. Co., 1927); Brickfield, "State Applications Asking Congress to Call a Federal Constitutional Convention," House Comm. on the Judiciary, 87th Cong., 1st sess. (Comm. print, 1961); Brickfield, "Problems Relating to a Federal Constitutional Convention," House Comm. on the Judiciary, 85th Cong., 1st sess. (Comm. print, 1957); Dixon, "Article V: The Comatose Article of Our Living Constitution?" 66 Mich. L. Rev. 931 (1968); "Ervin, Proposed Legislation to Implement the Convention Method of Amending the Constitution," 66 Mich. L. Rev. 875 (1968); Graham, "The Role of the States in Proposing Constitutional Amendments," 49 ABAJ 1175 (1963); Kauper, "The Alternative Amendment Process: Some Observations," 66 Mich. L. Rev. 903 (1968); Packard, "The States and the Amending Process," 45 ABAJ 161 (1959); Forkosch, "The Alternative Amending Clause in Article V," 51 Minn. L. Rev. 1053, 1075 (1967).

[3]1 Elliot, *The Debates in the Several State Conventions on the Adoption of the Federal Constitution* 120 (2d ed., 1836) (hereinafter "Elliot").

The requirement of unanimous consent stood squarely in the way of what a majority of the delegates wanted to do. They wanted to propose sweeping changes in the old system, and they had no reason to believe that their proposals would be universally accepted. Rhode Island had not even bothered to attend the convention. Congress, whatever views it might otherwise have entertained, stood to be abolished by the proposed reform. If the Framers adhered to the amendment procedure set out in the Articles and in the statute, they faced a prospect of failure. Because they greatly feared the consequences of failure,[4] they boldly chose to ignore the law.[5] They drafted their new Constitution in secret session; and when they emerged at the end of the summer, they proposed that their plan should take effect upon ratification, not by Congress or by the legislatures of the States, but by popular conventions in the States. Moreover, they proposed that ratification by conventions in nine States would be "sufficient for the Establishment of this Constitution *between the States so ratifying the Same.*" *See* Constitution of the United States, Article VII, Clause 1. [Emphasis added.] In a word, the Framers invited conventions in nine States to abolish the Union.

Congress received this plan and demurred, transmitting it to the States. Conventions in 11 States approved it, and the plan went into effect. In March, 1789, a new Congress (a Congress of the eleven United States of America) assembled in New York; and it was clear by then that a fundamental change had occurred. In accordance with the Framers' design, under the compulsion of political necessity and in the face of positive law to the contrary, a confederation of 13 States had been abolished by action of a dedicated majority; and a new government, resting on different principles, had been established among 11 of the former confederates.[6]

---

[4] George Washington, who was not given to overstatement, summarized the desperate condition of the Confederacy in the following way:

> That something is necessary, all will agree; for the situation of the General Governmt. (if it can be called a governmt.) is shaken to its foundation, and liable to be overset by every blast. In a word, it is at an end, and unless a remedy is soon applied, anarchy and confusion will inevitably ensue.

Letter to Thomas Jefferson, May 30, 1787, reprinted in 29 *Writings of Washington* 224 (Fitzpatrick ed., 1931).

[5] As Edmund Randolph put it, "There are great seasons when persons with limited powers are justified in exceeding them * * * ." 1 Max Farrand, *The Records of the Federal Convention of 1787,* 262 (rev'd ed., 1966) (hereinafter, "Farrand"). George Mason agreed that "there were besides certain crises, in which all ordinary cautions yielded to public necessity." 1 Farrand at 338. At another point in the debate James Wilson declared that "[t]he house on fire must be extinguished, without a scrupulous regard to ordinary rights." 2 Farrand at 469.

[6] The abolition of the Articles of Confederation and the establishment of the new Constitution was a peaceful revolution. It was an act of will that altered a frame of government in a way that was inconsistent with existing law governing how such alterations were to be made. Madison himself admitted that this was the best legal argument against what the Framers had done: Their proposal was defective because the new Constitution was to be approved and established in a way that was contrary to positive law. *The Federalist,* No. 40, at 263 (Cooke ed., 1961). Madison, a good lawyer, had no answer for that argument on the merits. There was no answer. He could only say that if the proposal were carried into execution on the approval of conventions in nine States, a justification could be found, not in positive law, but in the fundamental democratic principles to which the Declaration of Independence had referred—the "Laws of Nature and of Nature's God" that conferred upon all men a right to alter bad governments in the face of existing legal forms. *Id.* at 265.

We have begun our discussion with this page of history to illustrate two points that have caused no little confusion in the traditional debate over limited, in contrast to general, conventions. We want to put them behind us.

First, the Convention of 1787 shows that law cannot execute itself. The people and their officers execute the law; and when enough of them choose to disregard it, law is ineffective. Whatever Article V of the Constitution may require or permit in the way of legal limitation on the process of amendment by convention, it can be no more effective than was its predecessor, Article XIII of the Articles of Confederation, if the citizens and their representatives undertake to disregard it.

The second point is related to the first. Some have argued that the Convention of 1787 demonstrates the illimitable nature of the convention process and the futility of academic inquiries into the legal parameters of that process, whatever they may be. We do not share that view. It is true that in revolutionary times, as in 1787, law may be disregarded and, indeed, overturned. But for 200 years this has been a Nation under law; and because the history of the Convention of 1787 shows so clearly how the observance and preservation of law, even fundamental law, depends ultimately on the consent of the people and their representatives, it demonstrates the importance and the urgency of questions such as the one you have raised. If it is for the people and their officers to execute Article V, it is our duty to understand what Article V requires and what it permits.

## II. The Procedural Nature of Article V

Article V contains two provisions that expressly limit the scope of the alterations that may be made in the Constitution. The first—"that no Amendment which may be made prior to the Year One Thousand Eight Hundred and Eight shall in any Manner affect the first and fourth Clauses in the Ninth Section of the First Article"—was legally and politically significant when drafted, but it has no present force. The second—that "no State, without its Consent, shall be deprived of its equal Suffrage in the Senate"—establishes a constitutional principle of fundamental importance.

These limitations on the amendability of the Constitution are significant for our purposes because they are the only limitations on subject matter that are expressly set out in Article V. With regard to all possible amendments, except those prohibited by these provisions, Article V is restrictive only insofar as it restricts the procedures by which amendments may be proposed and ratified. The question we must answer is whether there are circumstances in which the procedures mandated by Article V may operate

in such a way as to confine the constitutional power of an Article V convention to a given field.[7]

We will state our conclusions in advance. First, we think that if a convention for proposing amendments were called under Article V, the constitutionally mandated procedures would operate to deprive the convention of power to make constitutionally viable proposals except with respect to subjects within a predetermined field. That field, however broad or narrow, would be defined by the extraordinary legislative act that initiates the convention process, the "Application" of the legislatures of the States. We will explain that conclusion and the reasons for it in Sections III and IV below.

Second, we think that Article V gives Congress no power to provide for the ratification of any constitutional proposal that is not developed and proposed in accordance with the procedures contemplated by Article V. Just as Congress would have no power to submit one of its own constitutional proposals for ratification unless two-thirds of the Members of both Houses were in accord that the proposal was necessary and desirable, Congress would have no power to provide for the ratification of any proposal propounded by a constitutional convention unless that proposal were responsive to the application that justified the gathering of the convention in the first instance. We will explain that conclusion and the reasons that support it in Section IV.

### III. The Role of the Legislatures of the States

Our analysis is dictated by the form of the procedure set out in the constitutional text. That procedure involves at least five different acts or steps: an initial "Application" by two-thirds of the legislatures of the States; a "call" to convention issued by Congress; a parliamentary convocation—the convention itself—attended by delegates selected and commissioned in a manner not specified by Article V; a designation by Congress of a "Mode of Ratification" for any proposal made by the convention; and ratification of any such proposal by three-fourths of the States in accordance with the mode prescribed by Congress. For our purposes, the critical step in this process is the first one, the "Application" of the legislatures of the States. What is this "Application?" What part does it play in the convention process? What power does it give to the legislatures of the States?

---

[7]The notion that the Constitution may give Congress power to impose adventitious subject matter restrictions on the convention process is one that finds no support in the text of Article V or in the drafting history. Congress, of course, has power to make "laws which shall be necessary and proper for carrying into Execution" the powers conferred upon it by Article V; but there is nothing in Article V that suggests that it would be necessary or proper for Congress to create subject matter restrictions that do not flow from the operation of Article V itself. Indeed, as we will discuss below, the history of the clause suggests rather clearly that it would be altogether unnecessary and improper for Congress to do so. The Framers created the convention procedure for the very purpose of preventing Congress from blocking amendments desired by the legislatures of the States and the delegates of the people in convention.

394

The participants in the traditional debate over limited in contrast to general conventions have given widely, sometimes wildly, different answers to these questions. Some have argued that the application can be nothing more than a neutral request for a convocation, a request that a forum be established in which constitutional questions may be debated and proposals made. Even if the legislatures have a specific problem in mind, even if they request a convention because they want the Constitution to be changed in some particular way, they must leave it entirely to the delegates to determine the course that the convention will take. Indeed, if their application manifests anything other than an unqualified desire for a convention with power to discuss and propose any amendment the delegates may want to propose, it is void. It cannot provide a constitutional basis for a convention under Article V.[8]

At the other extreme, some have thought that the application process is designed to give the legislatures plenary power to determine both the form and the content of the proposals that the convention may submit to the States for ratification. Not only may the legislatures request that Congress call a convention to consider a particular problem or a particular proposal, they may frame amendments and demand that the convention do nothing more than vote on those amendments as framed. This view has been espoused in one form or another by several scholars,[9] and it lies at the heart of some of the applications[10] that have been submitted to Congress by the States from time to time.

We cannot adopt either of these views—the view that the legislatures have no power to determine what work the convention may or must do, or the view that the legislatures have plenary power to propose amendments and to require that the convention do nothing more than emit them or quash them as it finds them good or bad. The first theory is mistaken. The second is viable, if at all, only in the most limited circumstances. The correct interpretation, we believe, lies elsewhere. The textual and historical reasons for that opinion are given in the paragraphs that follow.

**Text.** "Congress * * * on the Application of two thirds of the Legislatures of the States, shall call a Convention for proposing Amendments * * * ." This language lends little support to the notion that the

[8] *See, e.g.,* Black, "Amending the Constitution: A Letter to a Congressman," 82 Yale L.J. 189, 202-03 (1972).

[9] *See, e.g.,* Van Alstyne, "Does Article V Restrict the States to Calling Unlimited Conventions Only?—A Letter to a Colleague," 1978 Duke L.J. 1295.

[10] The applications have come in a wide variety of forms. The following passage from a recent resolution adopted by the legislature of the State of Kansas (May 19, 1978) requests a convention for the "sole and exclusive" purpose of proposing an amendment, the specific terms of which are prescribed by the applicant:

Be it further resolved: That alternatively, the Legislature of the State of Kansas hereby makes application to the Congress of the United States to call a convention for the sole and exclusive purpose of proposing an amendment to the Constitution of the United States which would require that, in the absence of a national emergency, the total of all appropriations made by the Congress for a fiscal year shall not exceed the total of all estimated federal revenues for such fiscal year.

legislatures of the States may demand that Congress call a constitutional convention for the sole purpose of voting up or down on proposals that the legislatures themselves have brought forward. The Framers were good draftsmen. When they wanted to give one body of government a veto over the proposals of another, they were able to use words that clearly expressed that purpose. In Article V itself they gave the States power to approve or disapprove what a constitutional convention might propose; but the language of Article V gives no indication that they intended this ratification process to be a second negative, a veto cast or withheld after the convention itself had voted up or down on someone else's work. As portrayed in the text, the convention is a respondent, not a censor. It is a "Convention for proposing Amendments." It responds to an application and call by making proposals for constitutional change.

What is the correct reading of the text? The polar view—the view that every Article V convention must be a general convention—is sometimes defended on textual grounds. It is said that the text has a plain meaning; that the legislatures are entitled to apply for a "convention" and a "convention" only and that this convention, being a "Convention for proposing Amendments," must be a convention for proposing amendments on any subject the delegates think proper.[11]

This argument is unpersuasive. The text does not say that the legislatures are to apply for a convention and a convention only. It says that they are to make an "Application." The text does not say that the convention must be a convention for proposing amendments on any subject the delegates think proper. It says that the convention will be a "Convention for proposing Amendments." These words are generic. They could describe a process in which the legislatures request, and Congress calls, a general convention, a convention for proposing amendments on any subject whatever. They could describe a process in which the legislatures request, and Congress calls, a convention for proposing amendments to deal with some particular problem or constitutional issue. There is little in the text that encourages us to prefer the one interpretation to the other. There is nothing in the text that requires us to choose between the two.

When we turn from the text and consult the relevant historical materials, the meaning of the convention clause comes more clearly into focus. We have outlined much of the relevant history in detailed notes, which are appended to this memorandum. In the discussion that follows we will describe the portions of that history that have decisive bearing on the question at hand.

**The Effort to Revise the Articles.** Although the Articles of Confederation allowed for amendment and specified that the unanimous consent of the States and Congress would be necessary before any alteration could

---

[11] *See* Black, *supra,* at 203.

occur, they established no regular method by which proposals for change could be formulated and submitted to the States and Congress. Thus when it became clear in the mid-1780s that changes in the Articles were necessary, the advocates of change were obliged to fashion *ad hoc,* irregular procedures in an effort to build consensus for the proposals they wished to bring forward. They drew on recent experience. Extraordinary intercolonial convocations had done much to spark and direct the rebellion against Great Britain. An interstate convention, the Continental Congress, had produced the Articles of Confederation. Convention procedures had been used or proposed in some States to make or alter fundamental law.[12] With these precedents in view, the activists set about to revise the Articles through a convention process.

Virginia took the lead. In 1786 it invited all the States to send delegates to a convention at Annapolis "to take into consideration the trade of the United States" and to propose a measure that would empower the national government to establish a uniform system of trade regulation.[13] Only five States accepted this invitation; and Hamilton and Madison, two of the youngest delegates, who had high hopes for a stronger union, were able to persuade the others that little could be accomplished by so few. Hamilton drafted a report that recommended that a second convention be called. This convention would be attended by delegates from all the States and it would have power to consider, not trade and commerce only, but

---

[12] By 1787, five State constitutions provided for amendment by way of convention. Three of these appear to have provided for a convention the powers of which could be limited to a particular subject matter. Georgia's Constitution of 1777 provided:

No alteration shall be made in this constitution without petitions from a majority of the counties, and the petitions from each county to be signed by a majority of voters in each county within this State; at which time the assembly shall order a convention to be called for that purpose, *specifying the alterations to be made,* according to the petitions preferred to the assembly by the majority of the counties as aforesaid. [Emphasis added.]

1 Poore, *Federal and State Constitutions, Colonial Charters and other Organic Laws* 383 (1872) (hereinafter "Poore"). Pennsylvania's constitution of 1776 provided:

The said council of censors shall also have power to call a convention, to meet within two years after their sitting, if there appear to them an absolute necessity of amending any article of the constitution which may be defective, explaining such as may be thought not clearly express, and of adding such as are necessary for the preservation of the rights and happiness of the people: But the articles to be amended, and the amendments proposed, and such articles as are proposed to be added or abolished, shall be promulgated at least six months before the day appointed for the election of such convention, for the previous consideration of the people, that they may have an opportunity of instructing their delegates on the subject. [2 Poore at 1548.]

The provision for amendment in Vermont's Constitution of 1786 was almost identical to that of the quoted portion of Pennsylvania's Constitution. *Id.* at 1874-75. The reference to "amending any article * * * which may be defective" and the requirement for promulgating the "articles to be amended, and the amendments proposed, and such articles as are proposed to be added or abolished" indicates to us that the convention was to be limited to certain topics. The two other States—Massachusetts and New Hampshire—had constitutions that appear to have allowed the convention more latitude. *See* 1 Poore at 972 (Massachusetts Constitution of 1780); 2 Poore at 1293 (New Hampshire Constitution of 1784).

[13] Commager, *Documents of American History* 132 (9th ed., 1973).

any matter that required constitutional correction. Hamilton's report was approved. When it was published, it became the "direct occasion of the gathering of the convention in Philadelphia that framed the constitution of the United States."[14]

Before we describe the nature of the proceedings in Philadelphia, we want to emphasize a legal point that is often overlooked in conventional accounts. The Annapolis Convention and its successor in Philadelphia demonstrate clearly and concretely that under the Articles of Confederation a convention could be convened for the purpose of considering constitutional problems and formulating proposals for change; and it could be given narrow or broad powers depending on the nature of the task assigned to it. The Articles did not spell this out. They did not establish procedures for the formulation of constitutional proposals. But they were permissive. They permitted the States and Congress to establish such procedures; and when the States and Congress exerted that power, the result was first a limited convention in Annapolis[15] and then a general convention in Philadelphia one year later.

In our view this is the most important single fact in the development of Article V. When the Framers drafted Article V, they were not writing on a clean slate. They had come together to rewrite a document that had already permitted a creative convention process to go forward, first at Annapolis and then at Philadelphia itself; and when we view their work from that perspective, the question of purposes and intents comes more sharply into focus. The Framers "constitutionalized" the convention process. Did they mean to confirm and preserve the flexible procedure that was permitted under the Articles, or did they mean to replace it with a rigid new system in which only one sort of convention, a general convention, was possible? As we review their work, we shall keep that question before us.

**The Proceedings of the Convention of 1787.** The delegates to the Philadelphia Convention agreed rather early that they should create a regular mechanism by which the new Constitution could be amended.[16] To

---

[14]Farrand, *The Framing of the Constitution* (1932).

[15]The Annapolis Convention was clearly a convention with limited powers. The delegates were so sensitive on that point that they felt there might be some question whether their recommendation of a general convention was strictly within their commission, and they took care to justify it. Hamilton wrote:

> If in expressing this wish [for a general convention], or in intimating any other sentiment, your Commissioners should seem to exceed the strict bounds of their appointment, they entertain a full confidence, that a conduct, dictated by an anxiety for the welfare of the United States, will not fail to receive an indulgent construction. [Commager, *Documents of American History* 133 (9th ed., 1973).]

Madison's later comment that the Annapolis Convention "did not scruple to decline the *limited task* assigned to it, and to recommend to the States a Convention with *powers adequate* to the occasion," and that the public mind "favored the idea there of a Convention with *fuller powers* for amending the Confederacy," recognized that a constitutional convention's powers might vary according to its mandate. Preface to Debates in the Convention of 1787, 3 Farrand at 545, 546. [Emphasis added.]

[16]A complete account of the proceedings relevant to Article V is set out in Appendix I.

accommodate that agreement, the committee that had been assigned the task of preparing the first draft of the Constitution, the Committee of Detail, submitted a modest proposal that was accepted by the convention after a brief debate. The form of the proposal was predictable, given the events of the preceding few years:

> On the application of the Legislatures of two thirds of the States in the Union, for an amendment of this Constitution, the Legislature of the United States shall call a Convention for that purpose. [2 Farrand at 188.]

We see, then, that when the Framers first undertook to fashion an amendment mechanism, they borrowed on the procedure that the States themselves had fashioned under the Articles. It was a mechanism that involved an interstate convention, called on application of the States. Two other features of this proposal deserve our attention. First, there was no requirement for ratification of the convention's action. Was such a requirement implicit? Second, the subject of the States' application, the "thing" for which they were to apply, was "an amendment of" the Constitution. What did the Framers mean by that language? Further proceedings would clarify that point.

Eleven days after the original proposal was accepted, it was reconsidered. There were objections. Elbridge Gerry noted that it contained no requirement for ratification of the mandatory action taken by the convention, and he feared that a majority of the convention might therefore bind the Union to innovations that would subvert the constitutions of the States.[17] Alexander Hamilton noted that the provision gave the State legislatures a right to "apply for alterations" but gave no similar right to the national legislature. This omission was problematical, because the national legislature would be the first to perceive the necessity of amendments, and the State legislatures would not apply for alterations "but with a view to increase their own power."[18] Finally, James Madison, with his usual foresight, objected that the convention process was vague and uncertain: How was the convention to be formed? By what rule was it to decide the questions before it? What would be the force of its acts?[19]

As a result of these objections the proposal of the Committee of Detail was replaced, after intervening changes, with a proposal drafted by Madison:

> The Legislature of the U— S— whenever two thirds of both Houses shall deem necessary, or on the application of two thirds of the Legislatures of the several States, shall propose amendments to this Constitution, which shall be valid to all intents and purposes as part thereof, when the same shall have been ratified by three fourths thereof, as one or the other mode of ratification may be proposed by the Legislature of the U.S. [2 Farrand at 559.]

---

[17] 2 Farrand at 557–58.
[18] 2 Farrand at 558.
[19] *Id.*

This provision did three things: First, to satisfy Hamilton, it gave the national legislature power to propose amendments on its own motion whenever two-thirds of both Houses thought it necessary to do so. Second, to satisfy Madison, it eliminated the convention as a device for formulating amendments and replaced it with a system in which the national legislature would propose amendments on the application of two-thirds of the legislatures of the States. Finally, to satisfy Gerry, it provided that no amendment would become effective unless it were ratified in final form by three-fourths of the States.

Madison's proposal was a significant one. It was a near predecessor of Article V, and it clarified the point that concerns us most. What role did the Framers intend for the legislatures of the States to play in the amendment process? Given the terms of Madison's proposal, there were two possibilities. It is conceivable that the legislatures were to apply to Congress for some unspecified change, any change, in the hope that Congress would propose amendments in the areas where they, the legislatures, thought amendments were necessary. The other possibility was that they were to apply to Congress for the changes that they, the legislatures, favored. They were to apply for amendments to the Constitution and to demonstrate to Congress, through their applications, that there was consensus among them as to the need for change in particular areas.

It cannot be argued with any force that Madison's proposal contemplated the first procedure, the application for a pig in a poke. The proposition was not that two-thirds of the legislatures would bestow on Congress, through their applications, a general commission to propose whatever amendments it thought necessary. Under Madison's system Congress had that power already, whenever there was consensus among two-thirds of both Houses. Rather, as Madison himself later confirmed, the legislatures were to apply to Congress for amendments to the Constitution, amendments that they, the legislatures, favored; and whenever there was consensus among two-thirds of them as to the need for an amendment or amendments, Madison's proposal required Congress to make specific proposals responsive to that consensus.

Two days before they finished their work, just five days after Madison's proposal had been accepted, the Framers reviewed the amendment mechanism once again. Roger Sherman spoke first. He feared that three-fourths of the States (the number needed for ratification of proposals initiated either by Congress or by the State legislatures) might "do things fatal to particular States," and he thought that the Constitution should therefore contain certain limitations on the kinds of amendments that could be made in it. In particular, he thought that no amendment should be permitted that would affect a State in its "internal police or deprive it of its equality in the Senate."[20] He ultimately prevailed on the latter point.

---

[20]2 Farrand at 629.

Second, George Mason noted that Congress was the only agency that was given power to propose amendments. He feared that Congress might abuse that power by refusing to propose amendments that would be beneficial to the people.[21] Gouverneur Morris and Elbridge Gerry then suggested that instead of giving Congress power to propose amendments on the application of the legislatures, the Constitution should require Congress to call a convention on application of the legislatures. This was the critical stage in the development of Article V. The Framers accepted the suggestion that Morris and Gerry had brought forward, and the result was the Convention Clause as we know it today. What was the purpose of the change?

We must be clear on what was changed and what was not. There was only a slight alteration in the text. It came in the words that described the powers of Congress: Madison's language—"Congress * * * on Application * * * shall propose Amendments to this Constitution"—became "Congress * * * on Application * * * shall call a Convention for proposing Amendments." There was no alteration in the description of what the legislatures were to do. They were to make an "Application" in each case. In procedural terms the change was equally modest. In both instances the legislatures were to make an "Application," and a separate body (Congress or the convention) was to propose amendments. The procedural change came with the introduction of an intervening step, a "call" to convention. This change was necessary for the simple reason that the convention, unlike Congress, is not a standing body. It must be called into being before it can do its work.

In substantive terms the change was dramatic. Morris and Gerry stripped Congress of power to propose amendments and relegated it to the ministerial function of calling a convention. The critical question is whether they intended to do anything more than this. They intended to alter the role of Congress. Did they intend to alter the role of the States? The whole point of the application process, under Madison's approach, was that it provided the legislatures of the States with a means of obtaining proposals responsive to their own views concerning the need for constitutional change. In relieving Congress of power to make those proposals, did Morris and Gerry intend as well to strip the legislatures of power to apply for favored amendments, or did they intend merely to replace one proposing authority (Congress) with another (the convention)?

Fortunately, the brief record of the debate over Morris' and Gerry's proposal gives us some insight into that question. As soon as the proposal was made, James Madison rose to comment on it. He said he did not see why Congress "would not be as much bound to propose amendments applied for by two thirds of the States as to call a Convention on the like application." He saw no objection, however, against providing for a convention

---

[21] *Id.*

401

"for the purpose of amendments, except only that difficulties might arise as to the form, the quorum etc. which in Constitutional regulations ought to be as much as possible avoided."[22]

Madison's statement goes to the heart of the question before us. It illustrates three points. First, it shows conclusively that under his proposal the legislatures of the States were entitled to apply for amendments to the Constitution, and that Congress was duty bound to make responsive proposals whenever two-thirds of them had done so: Congress was "bound to propose amendments applied for by two thirds of the States." Second, it suggests rather strongly that the convention proposal was an attempt to diminish the power of Congress over the process of amendment initiated by the applications of the legislatures. That was how Madison interpreted it. He was saying that although he had no substantial objection to the convention device, he could see no real reason for it, given its purpose. It provided neither more nor less protection from congressional abuse than the procedure he had fashioned, for "Congress would be as much bound to propose amendments applied for by two thirds of the States as to call a convention on the like application."

Finally, Madison's statement tells us a good deal about the intended role of the legislatures of the States. His statement is significant both for what it says and for what it does not say. Remember that the purpose of Madison's application procedure was not to give Congress power to propose amendments. (Congress had that power already.) The purpose was to give the State governments a right to apply for amendments. If Morris and Gerry had intended to change all that, stripping the legislatures of power to demand proposals responsive to their views, the mere substitution of one proposing authority for another would have been the least significant part of their plan. Madison's statement betrays no hint that such a radical change was in the offing. Indeed, Madison's statement suggests that the role of the legislatures would be unaltered under Morris' and Gerry's proposal: Congress would call a convention for proposing amendments "on the like application."

**The Ratification Debates.**  The notion that the amendment procedure should make some provision for the regular governments of the States and should be responsive in part to their views concerning the need for constitutional change was not a radical notion in 1787. In fact, as we have seen, this was one of the few propositions that was not debated in connection with the amendment question. The Framers had real doubts about the role that the new national legislature should play in the amendment process. They were also concerned that the Constitution should not be so freely amendable that a majority of the States would be able to oppress the others by altering the supreme law of the land in some discriminatory way. But if the Constitution were to be amended at all, there was not much

---

[22]2 Farrand at 629-30.

doubt that the States as States were proper parties to suggest where the amendments should come and to demand that proposals responsive to their views be formulated.

This should come as no surprise. Repeated assertions of Federal power have enhanced the role of the Federal Government in our national life, but in 1787 the State governments were the most important governments in the Union. It was they who had created the Union; and when questions arose concerning the adequacy of the Articles, they were very much the parties in interest. For that reason alone it was politic, and perhaps even necessary from the standpoint of securing ratification of the new Constitution, that the States, acting through their regular governments, should have been given a means of obtaining viable proposals for change responsive to their own views concerning the need for change. We have suggested that the Framers intended to provide them with such a means; and when the Framers published their work and undertook to defend it, they and their allies took care to reassure the States on that point. A few of the relevant remarks, made during the critical months when ratification of the new Constitution was still in doubt, are set forth below.

Many opponents of the new Constitution found it so objectionable that they argued that the question of revising the Articles should be submitted to a second general convention at which the imperfections in the document produced by the Framers could be eliminated. Alexander Hamilton, taking his cue from John Jay, argued forcefully in *The Federalist* that even if the new Constitution were thought to be imperfect, it would be far easier to remove the imperfections by amending it after it had been adopted than by convening a second general convention for that purpose prior to ratification. His argument on that point is perhaps the clearest statement by any of the Framers concerning the nature and significance of the Convention Clause.[23]

At a second general convention, Hamilton said, many questions would arise; and "[m]any of those who form the majority on one question may become the minority on a second, and an association dissimilar to either may constitute the majority on a third."[24] As a result, at a second general convention there would be "an immense multiplication of difficulties and casualties in obtaining the collective assent to the final act."[25] By contrast, under the new Constitution, if it were adopted, reformers would be able to utilize the surgical amendment process set out in Article V. It would be unnecessary to attempt more than one improvement at a time. Proposed amendments "might be brought forward singly * * * . [T]he will of the requisite number would once bring the matter to a decisive issue. And consequently, whenever nine or rather ten States were united in the desire of

---

[23]*See, The Federalist*, No. 85, at 591–93 (Cooke ed., 1961).
[24]*Id.* at 592.
[25]*Id.*

403

a particular amendment, that amendment must infallibly take place * * * . [T]wo-thirds [nine] may set on foot the measure, three-fourths [ten] must ratify."[26] Could the national legislature frustrate this process? It could not. The national legislature controlled one of the two amendment mechanisms, but not the other. Congress would be obliged to call a convention on the applications of two-thirds of the States. Would the legislatures be able to muster the necessary two-thirds? They would. "However difficult it may be supposed to unite two-thirds or three-fourths of the state legislatures, in amendments which may affect local interests, [there cannot] be any room to apprehend any such difficulty in a Union on points which are merely relative to the general liberty or security of the people. We may safely rely on the disposition of the State legislatures to erect barriers against the encroachments of the national authority."[27]

Hamilton was saying, in sum, that if the State legislatures wanted to perfect the new Constitution or "to erect barriers against the encroachments of the national authority," they could utilize the convention procedure, they could bring measures forward with that end in mind, and they could do this without submitting to the difficulties of a "general" convention in which disagreements over other points might prevent or impede remedial action. The State legislatures could use the convention procedure without hazarding a general convention.

Madison made a related observation regarding the role of the State governments. He said that the Framers had foreseen "that useful alterations will be suggested by experience." They had therefore created an amendment mechanism that "equally enables the general and the State governments to originate the amendment of errors as they may be pointed out by the experience on one side or on the other."[28] Some have attempted to cast this statement in a different light, but we think that Madison's meaning is clear. The State governments, like the national government, would discover faults or "errors" in the Constitution from time to time; and the State governments, like the Federal Government, had been given a mechanism by which their views regarding the correction of these faults could be given constitutional effect. The State governments were entitled to ask for the correction, not of errors perceived by others, but of errors perceived by themselves. What gave them this right? It was the convention procedure set out in Article V.

Other statements by the Framers bear this point out. Washington, who had presided over the Convention of 1787, said flatly that the "constitutional door is open for such amendments as shall be thought necessary by nine States."[29] Nine, of course, was the number required to originate the

---

[26]*Id.*

[27]*Id.* at 593.

[28]*The Federalist,* No. 43, at 296 (Cooke ed., 1961).

[29]Letter to John Armstrong, April 25, 1788, reprinted in 29 *Writings of Washington* 466 (Fitzpatrick ed., 1939).

amendment process. Judge Dana of Massachusetts said that if specific amendments were generally wished for, "two thirds of the several States [could] apply for the call of a convention to consider them."[30] In Virginia, Wilson Nicholas predicted that the convention procedure would prove to be a convenient method of amendment because, among other things, "the conventions which shall be called will have their deliberations confined to a few points, no local interests to divert their attention; nothing but the necessary alterations."[31] As against the critics of the new Constitution who thought that amendments should be obtained prior to ratification, Madison answered that "they cannot but see how easy it will be to obtain subsequent amendments. They can be proposed when the legislatures of two thirds of the States shall make application for that purpose."[32]

Hamilton, Madison, Washington, and their allies were perhaps guilty of over-argument, but we cannot believe that they were dissembling. We think their remarks about the ease and desirability of introducing subsequent amendments to the Constitution through the convention process show clearly that they envisioned that the States could use that process for the purpose of introducing into the Constitution particular amendments deemed necessary by the States and that they could do this without reopening the constellation of other issues that the delegates in Philadelphia had so lately resolved. The legislatures could invoke the convention process for a particular purpose without risking a general convention.[33]

**Summary.** After reviewing the text in light of the relevant historical materials, we are inclined to think that the Convention Clause has been misnamed. It should have been named the "Application Clause," because its basic purpose was to provide the regular governments of the States with

---

[30]2 Elliot at 138.

[31]3 Elliot at 102.

[32]2 Elliot at 629–30.

[33]The Federalists' praise of the convention procedure as a convenient device for introducing postratification amendments died out rather quickly after the ratifying convention in New York, the last key State to ratify the Constitution, narrowly gave its approval and then immediately circulated a letter urging the States to petition for a second general convention to redo what the Framers had done. The Virginia Assembly followed with a slightly narrower petition for a convention to consider the defects that had been suggested in the various State ratifying conventions. The Federalists vigorously opposed the drive for a second general convention, perceiving correctly that it would work to the advantage of the anti-Federalists, reopening divisive issues. Juxtaposed to their arguments in support of Article V, their opposition to the initiative of New York and Virginia lends further support to the view that the convention process was thought to be a flexible procedure could be used broadly (as New York proposed), or narrowly (as Hamilton suggested), depending on the nature of the consensus among the originating States. See Appendix III.

For some of the pertinent original sources, see Madison, Letter to George Eve, January 2, 1789, 11 *Papers of James Madison* 405 (Rutland ed., 1977); 3 Elliot at 630; 5 *Writings of James Madison* 299, 311-12 (Gaillard Hunt ed., 1904). *See also* Madison, Letter to G. L. Turberville, November 2, 1788, 5 *Writings of James Madison* 299-300 (Gaillard Hunt ed., 1904); Madison, "General Remarks on the Convention," 3 Farrand at 455; Jefferson, Letter to William Short, December 8, 1788, 14 *Papers of Thomas Jefferson* 344 (Boyd ed., 1958); Jefferson, Letter to William Carmichael, December 25, 1788, 14 *Papers of Thomas Jefferson* 385 (Boyd ed., 1958).

a means of applying for amendments to the Constitution; and the convention procedure was simply a device, one of two devices considered by the Framers during the evolution of the clause, through which the demands of 13 contentious States were to be reconciled. As described by the Framers and invoked by the States, the process was a flexible one, much like the nonconstitutional process that had been worked out by the States themselves under the Articles. The legislatures could use Article V to gather a general convention to build consensus for an integrated, comprehensive revision of the Constitution or for multiple amendments. New York and the anti-Federalists pressed for such a convention in 1788 and 1789. On the other hand, if the legislatures feared the divisiveness of a general convention (as did Madison and his allies), yet were in substantial agreement regarding some particular problem or issue, they could, as Hamilton suggested, generate specific proposals through the convention procedure without risking a general convention.

### IV.  Legal Aspects of a Limited Application by the Legislatures

If we had been able to conclude that the legislatures of the States are entitled to apply for one thing and one thing only—a general convention—our inquiry would be at an end. Because we have concluded that the legislatures may invoke the convention process for different purposes and with limited objects in view, we must consider two additional questions. First, if different legislatures apply for different kinds of conventions, how does Congress respond? Faced with applications at variance with each other, how does Congress judge whether the legislatures have made the sort of application that can provide a basis for a call to convention? Second, if Congress does call a convention on the basis of an application for something other than a general convention, what power does the convention have? Does it have power to go beyond the application and make ratifiable proposals that are not in accord with the tenor of the application and call?

The answer to each of these questions follows rather clearly and easily from what we have already said about the role of the legislatures of the States and the function of the application procedure. When we have established this connection—the connection between the role of the legislatures, the function of the application procedure, the role of Congress in determining whether a convention should be called, and the power of the convention itself—the political and legal logic of the Convention Clause will come sharply into focus.

Counting Application.  If one-half of the legislatures apply for a convention for proposing amendments on the subject of reapportionment and the other half apply for a convention for proposing amendments to abolish the electoral college, how should Congress respond?[34] Article V

---

[34]The historical response of Congress to the problem presented by applications for convention is described in some detail in Appendix II. The nature of some of the early applications and their bearing on the interpretation of Article V are described in Appendix III.

says that Congress must call a convention whenever two-thirds of the legislatures have made an "Application." If two-thirds or more of them have applied for a convention, does it matter that they are divided among themselves regarding the work that the convention should do?

The historical materials that we have already discussed suggest that it matters very much indeed. The States cannot launch an amendment unless there is a consensus among two-thirds of them that will provide a political basis for the proposal. Recall Hamilton's argument in *The Federalist*—if the new Constitution were adopted, the States would be able to obtain amendments that would curb the powers of the central government, but it would take two-thirds of them to float any given proposal—two-thirds to set the measure on foot. Washington said much the same thing. Madison's analysis was the most revealing of all. Madison said that Article V "equally enables" Congress and the legislatures of the States to originate the "amendment of errors" perceived at one level of government or the other. In other words, the power of the legislatures to initiate the amendment process is equal to that of Congress. When can Congress originate "the amendment of errors"? Congress can propose a constitutional amendment if, but only if, there is an extraordinary agreement among two-thirds of the Members of both Houses that an amendment is necessary. If one-half of the Members favor an amendment on the electoral college, Congress has no power to propose an amendment on either subject. Do the States have greater power? We are willing to take Madison at his word. Their power is equal to that of Congress, not greater. Unless there is general agreement among two-thirds of the legislatures over the nature of the change, or the area where change is needed (be it a general revision of the Constitution or a change in some specific area), the amendment process cannot go forward via the convention route.

When we view the application process in that light, we begin to understand the political wisdom of Article V. The Framers wanted to make the Constitution amendable, but they understood the trauma of the amendment process. They had experienced it themselves. Through a great exertion, they had established a new frame of government, and they did not want additional proposals for change to be loosed on the young republic unless there were a firm basis for believing that the process would be worth the political cost. To provide a guarantee of that sort, they established an exclusive two-track system for formulating viable, ratifiable constitutional proposals. Under that system no proposal for change can be issued by any authority unless there is a preexisting consensus supportive of change among an extraordinary majority at one level of the government or the other.

How, then, does Congress determine when to call a convention? If the foregoing analysis is correct, Congress must answer two questions of fact. What do the legislatures want? How many of them want it? The Constitution does not simplify the task. It does not specify a form of words or a style of application through which the wishes of the legislatures are to be

transmitted to Congress. It permits them to apply for different things in different ways. But in the end Congress' job is straightforward and unmysterious. Congress must simply assess the applications that are made, determine whether there is common ground among them, and call a convention whenever two-thirds of the applications exhibit a consensus supportive of some particular constitutional change.

This view of the role of Congress in counting divergent applications has been advocated by a substantial number of commentators. *See* Appendix II, note 3. It has also played an important role in the arguments of some of the dissenters, who object at the threshold to the very idea of applications of limited subject. The argument is this: If applications of limited subject were permitted, Congress would be obliged to respond to them. It would be obliged to review them for content and make judgments from time to time about the nature of the consensus they express, if any. Moreover, if Congress were ever to call a convention on the basis of limited applications of limited subject, it might even be required or empowered to take legislative action in connection with the call that would limit the power of the convention in accordance with the tenor of the applications. But the drafting history of the Convention Clause shows that the Framers did not want the national legislature to interfere with the convention process. They did not want Congress to make substantive judgments that could block or channel the development of constitutional proposals via the convention route. Accordingly, the State legislatures cannot be permitted to file applications of limited subject in the first place. They must file uniform applications for a convention process that are neutral with respect to subject. Only then—only when the task of Congress is limited to that of counting uniform applications for a convention with general powers—can the possibility of impermissible congressional intervention be eliminated.

We agree with the foundations of this argument, but the conclusions are flawed, in our view. It is perfectly clear that the Framers intended that the national legislature would have no independent power to determine what a constitutional convention may or may not do; but it stands history on its head to argue that the Framers must therefore have intended to deny that power to the State legislatures and to abandon the question of constitutional change to a transient majority of delegates at a convention with general powers. Conscientious scholars may differ over these points; but as we have stated above, we think the relevant historical materials demonstrate that the application procedure was designed to give the regular governments of the States an opportunity to apply for amendments favored by them, that the two-thirds requirement, which is present in both amendment mechanisms, was designed to ensure that no ratifiable constitutional proposal could ever be floated unless it were responsive to a preexisting consensus among an extraordinary majority at the one level of government or the other, and that the Framers inserted the convention device into the application process, not to frustrate either of these purposes, but to guarantee that an entity other than Congress would be charged with the duty of responding substantively to the applications of the States.

408

Aside from the historical considerations, there is another difficulty here. The basic constitutional choice is between a flexible application procedure and a rigid application procedure—between a procedure in which the legislatures are free to apply for what they want, and a procedure in which they may apply for a general convention only. The choice between these two procedures simply cannot be made on the ground that the one gives Congress power to frustrate the desires of the other participants in the convention process, whereas the other does not. Under the flexible procedure the legislatures are free to do precisely what they are entitled to do under the rigid one, and Congress is empowered to do neither more nor less. Under the flexible procedure the legislatures are free to apply for a general convention, if two-thirds of them are willing to solicit and entertain proposals on any subject; and Congress must respond whenever two-thirds of them have done so. The real difference between the two procedures lies, not in the way they allocate power between Congress and the legislatures, but in the way they allocate power between the legislatures and the convention itself. Under the rigid procedure the role of the convention is to follow wherever its delegates lead; and the convention is invariably empowered to do so, whatever the desires of the legislatures may be. Under the flexible procedure the convention is the servant of the legislatures. Its function is to respond to the extraordinary consensus that was the predicate for the call. For all the reasons given above, we think the latter conception is the one to be preferred. It is the more defensible of the two, given the history and logic of Article V.

Before passing to the final question, the question of the power of the convention, we want to say a word about a point raised at the beginning of our discussion. How does Congress treat an application that requests, not only that a convention be called to consider a particular problem or proposal, but that the convention do nothing more than approve and issue a specific amendment containing terms that have been drafted by the applicant? At the outset we stated that applications of this kind, which on their face appear to foreclose any possibility of adjustment or compromise, are viable only in very limited circumstances. We are now in a position to see why that is so. If a legislature demands that a convention do nothing more than accept a predetermined draft, it drastically reduces the potential for agreement between its application and the applications of other States. Even among applications directed at the same general problem, an application that affirmatively excludes any approach but its own adds little if anything to the consensus required for the call to convention. We must take "application" at face value. If the applicant wants a convention for the sole and exclusive purpose of issuing its own proposal and none other, there can be no common ground between its views and the views of any other applicant unless the other is willing to forego everything else and acquiesce in the narrow demand. The other is, of course, free to acquiesce by modifying its application. But if its application remains at variance with the one, there is grave doubt that Congress could find, on the face of the applications, any zone of actual agreement between the two.

**The Power of the Convention.** If our conclusions regarding the role of the legislatures and the function of the two-thirds requirement are correct, the ultimate question—the question of the convention's power—almost answers itself. We need to make only one additional analytical point.

Anyone is free to make constitutional proposals, but no proposal can be accepted by the States and become part of the Constitution unless it is formulated in accordance with the procedures set out in Article V. The Department of Justice or the State of Michigan can make constitutional proposals; but these proposals however, meritorious or inviting, cannot be ratified by the States. Congress itself can make proposals, but it can submit them for ratification only if it has complied with the constitutional procedures governing the formulation of proposals for change. Congress can submit proposals for ratification only if two-thirds of the Members of both Houses find them necessary.

As we have suggested in the preceding discussion, the meaning of the Convention Clause is simple and clear. A constitutional convention convenes, if at all, to make proposals responsive to a substantive consensus among the legislatures of the States. The consensus may be general or narrow. It may call for a general reexamination of the Constitution, or it may be a relatively specific agreement among the legislatures about the desirability of a particular change. In any case, the function of the two-thirds requirement in the application process is to ensure that no convention will be convened and no proposal made unless there is an agreement among an extraordinary majority of the governments of the States that would justify a responsive proposal and the ratification effort. As Hamilton put it, it takes two-thirds to set the measure on foot. That being so, it is unimportant that the delegates to a constitutional convention may have a moral or legal duty to respect the tenor of the application and call that brought them there. They may well have such a duty or duties, but the important point is that they have, in our view, no power to issue ratifiable proposals except to the extent that they honor their commission. They have no more power to go beyond the consensus that summoned them to convention than does Congress to propose amendments that are not responsive to a consensus among two-thirds of its Members.

We have one final word. Congress has been given power to specify a mode of ratification for constitutional proposals that have developed in accordance with Article V. It has no power to provide for the ratification of any constitutional proposal except those that have been formulated in accordance with Article V. Congress could not, for example, provide for the ratification of a constitutional proposal submitted for ratification by a bare majority of its Members. Likewise, it could not provide for the ratification of a proposal emitted by a constitutional convention for which less than two-thirds of the States have applied.

JOHN M. HARMON
*Assistant Attorney General*
*Office of Legal Counsel*

## APPENDIX I

### Proceedings of the Convention of 1787

When the delegates met in Philadelphia, their discussion first centered on a plan of the union submitted by Edmund Randolph on behalf of the Virginia delegation. The 13th resolution of that plan dealt with the question of amendment:

. Resd. that provision ought to be made for the amendment of the Articles of Union whensoever it shall seem necessary, and that the assent of the National Legislature ought not to be required thereto.[1]

This resolution, in a slightly modified form ("that provision ought to be made for [hereafter] amending the system now to be established, without requiring the assent of the National Legislature),[2] was first debated on June 5. Although Pinckney "doubted the propriety or necessity of it,"[3] Elbridge Gerry favored the provision:

The novelty & difficulty of the experiment requires periodical revision. The prospect of such a revision would also give intermediate stability to the Govt. Nothing had yet happened in the States where this provision existed to proves [sic] its impropriety.[4]

The convention then postponed further deliberation on the provision.[5]

The provision "for amending the national Constitution hereafter without consent of National Legislature" was next discussed on June 11.[6] Several members "did not see the necessity of the [resolution] at all, nor the propriety of making the consent of the National Legislature unnecessary."[7] George Mason, however, urged that the provision was necessary:

The plan now to be formed will certainly be defective, as the Confederation has been found on trial to be. Amendments therefore will be necessary, and it will be better to provide for them, in an easy, regular and Constitutional way than to trust to chance and violence. It would be improper to require the consent of the Natl. Legislature, because they may abuse their power, and refuse their consent on that very account. The opportunity for such an abuse may be the fault of the Constitution calling for amendment.[8]

---

[1] 1 Farrand at 22.
[2] 1 Farrand at 121.
[3] *Id.*
[4] 1 Farrand at 122.
[5] *Id.*
[6] 1 Farrand at 202.
[7] *Id.*
[8] 1 Farrand at 202–03.

411

Edmund Randolph supported Mason's arguments. The convention, however, postponed action on the words "without requiring the consent of the national Legislature." The other portion of the clause ("provision ought to be made for the amendment of the Articles of Union whensoever it shall seem necessary") was passed without dissent.[9]

The provision as passed was then referred to the Committee of Detail. That committee fashioned the first draft of the Constitution and submitted it to the convention on August 6. Article XIX of that draft provided for amendment as follows:

> On the application of the Legislatures of two thirds of the States in the Union, for an amendment of this Constitution, the Legislature of the United States shall call a Convention for that purpose.[10]

This provision was considered on August 30. Gouverneur Morris suggested that "the Legislature should be left at liberty to call a Convention, whenever they please."[11] Notwithstanding this suggestion, the provision was agreed to without dissent.

On September 10 Gerry moved to reconsider Article XIX. Since the Constitution was "to be paramount to the State Constitution," he feared that "two thirds of the States may obtain a Convention, a majority of which can bind the Union to innovations that may subvert the State Constitutions altogether."[12] Alexander Hamilton seconded Gerry's motion. He did not object to the consequences feared by Gerry, for "there was no greater evil in subjecting the people of the U.S. to the major voice than the people of a particular State."[13] Rather, Hamilton argued:

> It had been wished by many and was much to have been desired that an easier mode for introducing amendments had been provided by the Articles of Confederation. It was equally desirable now that an easy mode should be established for supplying defects which will probably appear in the new System. The mode proposed was not adequate. The State Legislatures will not apply for alterations but with a view to increase their own powers—The National Legislature will be the first to perceive and will be most sensible to the necessity of amendments, and ought also to be empowered, whenever two thirds of each branch should concur to call a Convention—There could be no danger in giving this power, as the people would finally decide in the case.[14]

---

[9] 1 Farrand at 203.
[10] 2 Farrand at 188.
[11] 2 Farrand at 468.
[12] 2 Farrand at 557–58.
[13] 2 Farrand at 558.
[14] *Id.*

412

Madison "remarked on the vagueness of the terms, 'call a Convention for the purpose,' as sufficient reason for reconsidering the article."[15] Specifically, Madison raised the questions, "How was a Convention to be formed? by what rule decide? what the force of its acts?"[16] After this debate, Gerry's motion to reconsider carried.[17]

Roger Sherman then moved that the following language be inserted into the Article: "or the Legislature may propose amendments to the several States for their approbation, but no amendments shall be binding until consented to by the several States."[18] James Wilson moved that the approval of only two-thirds of the States should be necessary, but this motion was defeated.[19] Wilson then moved to require the approval of three-fourths of the States, and this motion was approved with dissent.[20]

Madison then moved, and Hamilton seconded, that the convention postpone consideration of the amended proposition and that it take up the following:

> The Legislature of the U— S— whenever two thirds of both Houses shall deem necessary, or on the application of two thirds of the Legislatures of the several States, shall propose amendments to this Constitution, which shall be valid to all intents and purposes as part thereof, when the same shall have been ratified by three fourths at least of the Legislatures of the several States, or by Conventions in three fourths thereof, as one or the other mode of ratification may be proposed by the Legislature of the U.S.[21]

Rutledge objected, on the ground that "he could never agree to give a power by which the articles relating to slaves might be altered by the States not interested in that property and prejudiced against it."[22] In order to obviate his objection, it was agreed to add to Madison's proposition the proviso "that no amendments which may be made prior to the year 1808 shall in any manner affect the 4 and 5 sections of the VII article."[23] As amended, Madison's proposition was adopted.[24]

The Committee of Style made minor changes in Madison's amended proposition and reported it as Article V to the convention.[25] On September 15, Sherman initiated debate on this provision by expressing his fears that

> three fourths of the States might be brought to do things fatal to particular States, as abolishing them altogether or depriving them

---

[15] *Id.*
[16] *Id.*
[17] *Id.*
[18] *Id.*
[19] 2 Farrand at 558–59.
[20] 2 Farrand at 559.
[21] *Id.*
[22] *Id.*
[23] *Id.*
[24] *Id.*
[25] 2 Farrand at 602.

of their equality in the Senate. He thought it reasonable that the proviso in favor of the States importing slaves should be extended so as to provide that no State should be affected in its internal police, or deprived of its equality in the Senate.[26]

George Mason also objected to the provision, for he

thought the plan of amending the Constitution exceptionable & dangerous. As the proposing of amendments is in both the modes to depend, in the first immediately, and in the second, ultimately, on Congress, no amendments of the proper kind would ever be obtained by the people, if the Government should become oppressive, as he verily believed would be the case.[27]

Morris and Gerry then moved to amend the provision "so as to require a Convention on application of two-thirds of the states."[28] Madison responded that he

did not see why Congress would not be as much bound to propose amendments applied for by two thirds of the States as to call a Convention on the like application. He saw no objection however against providing for a Convention for the purpose of amendments, except only that difficulties might arise as to the form, the quorum &c. which in Constitutional regulations ought to be as much as possible avoided.[29]

The Convention thereupon agreed to Morris' and Gerry's proposal.[30]

Sherman then moved to strike the requirement of three-fourths for ratification, in order to leave "future Conventions to act in this matter, like the present Conventions according to circumstances."[31] This motion failed, as did Gerry's motion to eliminate ratification by convention.[32] Sherman then moved to add a further proviso "that no State shall without its consent be affected in its internal police, or deprived of its equal suffrage in this Senate."[33] Madison objected, on the ground that incorporation of "special provisos" would lead every State to "insist on them, for their boundaries, exports, etc."[34] The motion was defeated; so too was Sherman's next motion to strike out Article V altogether.[35] Morris then moved to add the single proviso "that no State, without its consent shall be deprived of its equal suffrage in the Senate." According to Madison, this motion was "dictated by the circulating murmurs of the small States" and was thus agreed to.[36] This completed deliberations on Article V.

---

[26]2 Farrand at 629.
[27]Id.
[28]Id.
[29]2 Farrand at 629–30.
[30]2 Farrand at 630.
[31]Id.
[32]Id.
[33]Id.
[34]Id.
[35]2 Farrand at 630–31.
[36]2 Farrand at 631.

# APPENDIX II

## Congressional Handling of Convention Applications

The States have filed more than 350 applications for conventions.[1] These applications have been on a wide variety of subjects; and as we have suggested, most authorities are of the view that applications on different subjects should not be aggregated for the purpose of determining whether a sufficient number of States has applied for a convention.[2] Congress has traditionally been of that view, for it has never, despite the large number of applications, called a convention.

On two occasions the Senate has approved legislation to establish convention machinery. In 1971 and 1973 the Senate passed identical bills written by Senator Ervin that were premised on the proposition that a convention might be called to consider a particular subject. The bills provided that any call to convention would "set forth the nature of the amendment or amendments for the consideration of which the convention is called." To enforce this restriction, they provided that each convention delegate would take an oath committing himself not to propose or vote for any proposed amendment not relating to the subject described in the call. The bills also allowed Congress to disapprove the submission of any proposed amendment to the States if Congress found that the proposal related to or included a subject that differed from the one specified by Congress.[3] These provisions were founded on the conclusion of the Senate Judiciary Committee that "the bill properly limits the scope of the convention to the subject or subjects" that caused the States to seek constitutional amendment in the first instance.[4]

---

[1] 125 CONGRESSIONAL RECORD (daily ed., January 15, 1979) (remarks of Senator Helms).

[2] See, e.g., Bonfield, "The Dirksen Amendment and the Article V Convention Process," 66 Mich. L. Rev. 949, 970 and n. 85 (1968). The opposite view is advanced by a few commentators who reason that even disparate demands show a widespread desire for constitutional changes. See, e.g., Orfield, Amending the Federal Constitution, 42 (1942). It is generally agreed, however, that applications on different subjects cannot be taken as an indication of general dissatisfaction with the entire Constitution. See, e.g., Note, 70 Harv. L. Rev. 1067, 1072 (1957).

[3] S. 215, 92d Cong., 1st sess. §§ 6(a), 8(a), 11(b)(1), 117 CONGRESSIONAL RECORD 36805 (1971); S. 1272, 93d Cong., 1st sess., 119 CONGRESSIONAL RECORD 22731-37 (1973).

[4] S. Rept. 336, 92d Cong., 1st sess. 10 (1971).

## APPENDIX III

### The Early Applications of the States

The States made few applications for conventions during the first 100 years after the Constitution was ratified. A majority of these early applications were for general conventions.[1] It has been argued that the States must therefore have thought themselves empowered to ask for general conventions only, and that this in itself is evidence that an Article V convention may not be called for a limited purpose.[2] We do not accept this view.

The earliest applications were made by Virginia in 1788 and by New York in 1789. The Virginia application referred to the numerous objections that had been made to the new Constitution:

> We do, therefore, in behalf of our constituents, in the most earnest and solemn manner, make this application to Congress, that a convention be immediately called, of deputies from the several States, with *full power to take into their consideration the defects of this constitution that have been suggested by the State Conventions,* and report such amendments thereto as they shall find best suited to promote our common interests, and secure to ourselves and our latest posterity the great and unalienable rights of mankind.[3] [Emphasis added.]

The New York application voiced a similar sentiment:

> The People of the State of New York having ratified the Constitution agreed to on the seventeenth day of September, in the year of our Lord one thousand seven hundred and eighty-seven, by the Convention then assembled at Philadelphia, in the State of Pennsylvania, as explained by the said ratification, in the fullest confidence of obtaining a revision of the said Constitution by a General Convention; and in confidence that certain powers in and by the said Constitution granted, would not be exercised, until a Convention should have been called and convened for proposing amendments to the said Constitution: In compliance, therefore, with the unanimous sense of the Convention of this State, who all united in opinion that such a revision was necessary to recommend the said Constitution to the approbation and support of a numerous body of their constituents;

---

[1]Brickfield, "Problems Relating to a Federal Constitutional Convention," 85–88, House of Representatives Judiciary Committee Print, 85th Cong., 1st sess. (1957). *See also* American Bar Association, *Amendment of the Constitution by the Convention Method Under Article V*, 59–72 (1974).

[2]Black, "Amending the Constitution: A Letter to a Congressman," 82 Yale L.J. 189, 201–03 (1972).

[3]1 ANNALS OF CONGRESS 248–49 (Gales & Seaton, eds. 1789).

and a majority of the members of which conceived several articles of the Constitution so exceptionable, that nothing but such confidence, and an invincible reluctance to separate from our sister States, could have prevailed upon a sufficient number to assent to it, without stipulating for previous amendments: And from a conviction that the apprehensions and discontents which those articles occasion, cannot be removed or allayed, unless an act to revise the said Constitution be among the first that shall be passed by the new Congress; we, the Legislature of the State of New York, do, in behalf of our constituents, in the most earnest and solemn manner, make this application to the Congress, that a Convention of Deputies from the several States be called as early as possible, *with full powers to take the said Constitution into their consideration, and to propose such amendments thereto, as they shall find best calculated to promote our common interests, and secure to ourselves and our latest posterity, the great and unalienable rights of mankind.*[4] [Emphasis added.]

Because both Virginia and New York expressed a general concern over the adequacy of the Constitution, it is not surprising that they applied for a general convention. These applications do not support the contention that the applicants believed that they could ask for a general convention only. Indeed, the inclusion in these applications of language specifying that the requested convention should have "full" or "general" powers suggests rather clearly that the powers of an Article V convention were not thought to be invariably general but were thought to be dependent on the terms of the applications of the States. It is unnecessary to request that a convention have full or general powers if full or general powers are the only kind of powers that a convention can have.

Applications for conventions were made at two other points during the first 100 years. During the nullification controversy three States filed applications. South Carolina resolved that "it be expedient that a convention of the States be called as early as practicable to consider and determine such questions of disputed power as have arisen between the States of this confederacy and the General Government."[5] Alabama "recommended" to Congress "the call of a Federal Convention to propose such amendments to the constitution as may be proper to restrain Congress from exerting the taxing power for the substantive protection of domestic manufactures."[6] Georgia applied to Congress to call a convention, to the end, among others, "that the principle informed in a Tariff for the direct protection of domestic industry may be settled" and "a system of Federal

---

[4]House Journal 29-30 (1789); 1 Annals of Congress 271 (1789).
[5]Senate Journal 83, 22d Cong., 2d sess. (1833).
[6]*Id.* at 194-95.

taxation may be established, which shall be equal in its operation upon the whole people * * * ."[7] In our view, these resolutions make no application for a convention with unlimited powers; rather, they request a convention for the purpose of addressing problems broadly identified in the applications themselves.

Some States applied for conventions during the period just preceding the Civil War. President Buchanan had recommended that the Congress or the State legislatures might originate "an explanatory amendment of the Constitution on the subject of slavery."[8] President Lincoln, while refraining from any "recommendation of amendments," had opined that "the convention mode seems preferable, in that it allows amendments to originate with the people themselves."[9] In accordance with that sentiment, several States—New Jersey, Indiana, Kentucky, Illinois, and Ohio—adopted resolutions applying to Congress for a convention. These resolutions were general in nature. Typically, they called for a "convention for proposing amendments."[10] One can argue that they indicate that the applicants believed their only recourse under Article V was to apply for a general convention, but one can argue with equal force that the form of these applications was dictated by the desire for a convention with unlimited power to avert the impending crisis.

---

[7]The Georgia application actually presented to the Senate contained an enumeration of "particulars" more extensive than those cited in the text. Senate Journal 65–66, 22d Cong., 2d sess. (1833). However, the one authority known to us to have studied this matter extensively states that the Georgia House resolution, containing this larger enumeration, had been substantially narrowed by the Georgia Senate to the form quoted in the text, but the Governor's Office mistakenly transmitted the House resolution to the Congress. See Pullen, *supra* (note 2) at 42–44.

[8]55 Congressional Globe, 36th Cong., 2d sess., app. 4 (1860).

[9]4 *Collected Works of Abraham Lincoln,* 269–70 (Basler ed. 1953).

[10]*See* the resolutions cited in Pullen, *supra* (note 2), at 79–85.